SH

WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Craig Devine, | No. CV-18-04286-PHX-MTL (MTM) |
|---|---|
| Plaintiff, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiff Craig Devine, who is currently confined at the Arizona State Prison Complex-Lewis, Morey Unit, in Buckeye, Arizona, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. Defendants move for summary judgment, and Plaintiff opposes the motion.[1] (Docs. 79, 110.)

**I.     Background**

Upon screening Plaintiff's First Amended Complaint (Doc. 22) pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated claims under the Americans with Disabilities Act (ADA) in Counts 1 and 3 against Defendants Ryan, Corizon, White, Garza, and Trinity Services Group and an Eighth Amendment claim in Count 2 against Defendants Ryan and Corizon for allegedly denying Plaintiff a medical diet and ordered these Defendants to answer. (Docs. 6, 23.)

Defendant Ryan subsequently retired, and David Shinn, who replaced Ryan as Director of the Arizona Department of Corrections (ADC), was substituted as a Defendant

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response. (Doc. 81.)

1    in his official capacity.  (Doc. 41.)  Defendant Ryan remains in his individual capacity only.

2    (*Id.*)

3          On February 26, 2021, the Court granted Plaintiff's Motion to Dismiss (Doc. 109)

4    as to Defendants Garza and Trinity Services Group and dismissed those Defendants with

5    prejudice.  (Doc. 117.)

6          Defendants Corizon, Shinn, Ryan, and White now move for summary judgment.

7    (Doc. 79.)

8    **II.     Summary Judgment Standard**

9          A court must grant summary judgment "if the movant shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

12   movant bears the initial responsibility of presenting the basis for its motion and identifying

13   those portions of the record, together with affidavits, if any, that it believes demonstrate

14   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

15         If the movant fails to carry its initial burden of production, the nonmovant need not

16   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

17   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

18   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

19   contention is material, i.e., a fact that might affect the outcome of the suit under the

20   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

21   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

22   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

23   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

24   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

25   it must "come forward with specific facts showing that there is a genuine issue for trial."

26   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

27   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

28

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Relevant Facts

On August 8, 2012, Plaintiff underwent an endoscopy at Maricopa Integrated Health System; he was ultimately diagnosed with celiac disease, and a gluten-free diet was recommended. (Doc. 111 (Pl.'s Statement of Facts) ¶¶ 1–2; Doc. 111-1 at 12 (Pl.'s Ex. A).)

On September 22, 2016, during Plaintiff's initial medical intake upon being admitted to the Arizona Department of Corrections (ADC), a no gluten/no potatoes diet was ordered by Physician's Assistant (PA) Nick Salyer with an expiration date of September 22, 2017. (Doc. 111-1 at 15 (Pl.'s Ex. B).) The "no potato" portion of this diet was rejected by ADC's food contract servicer, Trinity, because Trinity did not offer a no potato diet. (Doc. 111 ¶ 4.)

On October 13, 2016, PA Salyer made a note that Plaintiff "can avoid potato in the gluten free diet, so we will add resources to make up for decreased nutrients." (Doc. 111-1 at 16.) Plaintiff weighed 206 pounds at the time; Plaintiff is 6 feet tall. (*Id.*) That same day, PA Salyer issued a Restricted Diet Order for Plaintiff to receive liquid supplements twice per day with an expiration date of October 13, 2017. (*Id.* at 17.)

On October 23, 2017, Plaintiff was approved for a no gluten diet. (Doc. 80-1 at 5 (Defs.' Ex. A).) His weight was documented as 201 pounds. (*Id.*) According to the Restricted Diet Order, the no gluten diet was to expire on October 23, 2018. (*Id.* at 8.) The Restricted Diet Order did not provide for liquid supplements. (*See id.*)

On January 30, 2018, Plaintiff submitted a Health Needs Request (HNR) complaining that:

> I just learned that the kitchen has been giving me gluten <u>everyday</u> for the past six months. I did not know it was gluten and I have been eating it. . . . Can you please check all my

- 3 -

1
2

> vitamin and mineral levels?  Also would you consider ordering
> an endoscopy to check my stomach and a bone density exam.

3   (Doc. 80-4 at 2 (Defs.' Ex. D) (emphasis in original).)  Defendant Registered Nurse (RN)
4   Angela White noted that a chart review was initiated.  (*Id.*)

5       On February 6, 2018, medical provider Nancy Smith conducted a chart review and
6   noted that there was no medical necessity for an endoscopy and that bone density testing
7   would be discussed at Plaintiff's next chronic care appointment.  (*Id.* at 3.)  Smith added
8   Vitamin D testing to Plaintiff's next labs.  (*Id.*)

9       On February 15, 2018, Plaintiff submitted an HNR stating, "I have submitted several
10  HNRs regarding complications with my celiac disease and was told to address them at
11  chronic care appointment, but no appointment is scheduled.  Will you please schedule my
12  chronic care appointment[?]"  (Doc. 80-6 at 2 (Defs.' Ex. F).)  Plaintiff also submitted
13  HNRs on February 3, 14, and 22, 2018 regarding the renewal of his diet.  (Doc. 111-1 at
14  19–21 (Pl.'s Ex. C).)  In response to two of these HNRs, Defendant White noted that an
15  appointment was being scheduled.  (*Id.* at 19, 21.)

16      On February 22, 2018, Plaintiff was seen by medical provider Smith regarding the
17  February 15 HNR, and Smith reviewed Plaintiff's most recent lab results with him.  (Doc.
18  80-6 at 2.)  The lab results "showed normal levels for celiac disease," and Smith noted that
19  Plaintiff was on a gluten allergy diet.  (*Id.*)  Smith also noted that Plaintiff was taking
20  Calcium and Vitamin D supplements and both of those levels were normal in his lab results.
21  (*Id.*)  Plaintiff's weight was 207 pounds.  (*Id.*)

22      That same day, Plaintiff submitted an HNR, stating:

23
> My diet is "no gluten with liquid resource X2 daily."  For some
24
> reason, the "gluten" and "resource" were given separate
> expiration dates.  The [liquid] resource expires <u>next week</u>.
25
> [RN] Wilson was supposed to forward it to the provider to
26
> rewrite the diet so they both expire at the same time. I saw the
> provider today and she has not received the request.  Please do
27
> not allow my diet to expire next week (3-5-18).

28
(*Id.* at 6 (emphasis in original).)  Defendant White noted that an inquiry was initiated.  (*Id.*)

On March 4, 2018, Plaintiff submitted another HNR complaining that he had been asking for his diet to be renewed for a month, and the "liquid resource X2 daily" portion of his diet had expired.  (Doc. 80-7 at 2 (Defs.' Ex. G).)  RN Wilson made a noted that Plaintiff's request was "not approved per provider at this time."  (*Id.*)

Plaintiff submitted another HNR on March 14, 2018 asking for his diet to be renewed and to be scheduled for an appointment with provider Smith.  (Doc. 80-8 at 2 (Defs.' Ex. H).)  Defendant White noted that "[t]he no gluten diet you are requesting is not available per provider."  (*Id.*)

On March 26, 2018, Plaintiff submitted an HNR regarding his attempt to renew the liquid resource portion of his diet.  (Doc. 80-10 at 2 (Defs.' Ex. J).)  Plaintiff asked for this request to be reviewed or for "Boost" drinks to be ordered instead.  (*Id.*)  Defendant White noted, "Resources are for low BMI inmates will inquire about Boost."  (*Id.*)

Between March 2, 2018 and April 7, 2018, Plaintiff's weight went from 209 pounds to 197 pounds.  (Doc. 111-2 at 7 (Pl.'s Ex. P).)

On April 9, 2018, Plaintiff submitted an HNR, which stated the following: "I have been on liquid resources x2 daily to compensate for the potatoes I can't eat. You keep ignoring my HNR's. Either give me back my resources or force the kitchen to provide me with a no gluten/no potato diet."  (Doc. 80-11 (Defs.' Ex. K).)  In response, Assistant Director of Nursing O. Coronado noted, "You have a gluten free diet until 10/23/18. Kitchen informed."  (*Id.*)

On May 1, 2018, Plaintiff submitted an HNR stating that on April 20, 2018, the provider ordered a no gluten with liquid supplements diet.  (Doc. 80-12 at 2 (Defs.' Ex. L).)  Plaintiff requested that this diet order be resubmitted and for the kitchen to be called so that they could start the diet today.  (*Id.*)  In response, Defendant White noted, "Please allow more time for the diet to be processed. This process can take up to a month."  (*Id.*)

On May 8, 2018, Plaintiff submitted an HNR regarding the status of the April 20, 2018 diet order.  (Doc. 80-13 at 2 (Defs.' Ex. M).)  Defendant White noted, "Diet takes 14

1   days to a month to process. Diet will not be entered into the system until it is approved by

2   Corporate." (*Id.*)

3       On June 16, 2018, Plaintiff submitted an Inmate Informal Complaint regarding his

4   request for his non-gluten diet:

5           I have food allergies and celiac disease. I have been tested to
            confirm these allergies . . . and have been ordered a diet
6           consistent with my needs. . . . My diet was renewed on 4-20-
            18 but was never put into effect. On 6-6-18, the provider
7           resubmitted the diet order and 10 days later the diet still has not
            started. . . . When my diet stops I can only eat the lunch meat
8           at breakfast and the vegetables at dinner.
9

10  (Doc. 80-14 at 2 (Defs.' Ex. N).)

11      On June 20, 2018, Plaintiff submitted an HNR stating that on June 6, 2018, the

12  provider ordered a non-gluten with liquid resources diet. (Doc. 80-15 at 2 (Defs.' Ex. O).)

13  Plaintiff stated that he had yet to receive the diet. (*Id.*) Defendant White noted, "Diet card

14  must be approved by Corporate." (*Id.*)

15      On July 1, 2018, Director of Nursing Tina Watts responded to the June 16 Informal

16  Complaint: "After review of your medical record [t]he medical provider did order a diet

17  for you Gluten and Liquid supplements on 6/6/2018 with future labs. Please discuss [a]t

18  next provider appointment regarding diet ordered." (Doc. 80-14 at 3.)

19      On July 9, 2018, Plaintiff submitted an Inmate Grievance regarding his request for

20  his non-gluten diet:

21          Recently, medical issued a policy that states all medical diets
            need to be renewed every 90 days. My diet was renewed on 4-
22          20-18 but never went into effect. The diet was rewritten on 6-
            6-18 and still has not started. The length of time it takes to
23          institute diets, combined with the required renewal every 90
24          days, ensures I will be [without] my diet for weeks or even
            months at a time, several times a year.
25

26  (Doc. 80-16 at 2 (Defs.' Ex. P).) On July 30, 2018, a response was given which stated:

27  "Your concern has been researched including a review of your medical records. I am

28

- 6 -

providing you with the following response: We are checking the status of your diet card and will follow-up with you within a few days with information." (*Id.* at 3.)

On July 19, 2018, and August 5, 2018, Plaintiff submitted HNRs regarding the status of the no gluten and liquid resource diet. (Doc. 80-17 at 2–3 (Defs.' Ex. Q).) Defendant White noted both times that an inquiry was initiated. (*Id.*)

On August 14, 2018, Nurse Practitioner (NP) Lawrence Ende conducted a chart review and noted, "No entries found in chart since only approved diets get entered. Previously approved for diet; diet sheet to be completed and inmate to sign." (Doc. 80-19 at 2 (Defs.' Ex. S).)

On August 20, 2018, Plaintiff submitted an HNR stating that the provider had placed an order renewing Plaintiff's diet, but he was still not receiving it and was continuing to lose weight while waiting for his diet to start. (Doc. 111-1 at 38 (Pl.'s Ex. I).)

On September 4, 2018, Plaintiff submitted an HNR stating that for two months, he had been told that he had a provider appointment, yet he has not been called, and that he had been waiting five months for his diet to actually start. (Doc. 80-20 at 2 (Defs.' Ex. T).) Defendant White noted that Plaintiff's provider appointment was overlooked somehow and was rescheduled. (*Id.*) In addition, Defendant White noted that diets go through Corporate, then the Arizona Department of Corrections, with no tracking. (*Id.*)

On September 7, 2018, NP Ende saw Plaintiff for a scheduled provider sick call. (Doc. 80-21 at 2 (Defs.' Ex. U).) Plaintiff stated that he was not getting his diet consistently. (*Id.*) NP Ende noted the following: "Contact Administration: No entries for diet in EOMIS; has card; has filled out numerous diet sheets since." (*Id.* at 4.) Plaintiff's weight was documented as 195 pounds. (*Id.* at 2.)

On September 10, 2018, Plaintiff submitted an HNR requesting for his no gluten with liquid resources diet to be started. (Doc. 80-22 at 2 (Defs.' Ex. V).) Plaintiff stated that this diet had been ordered twice before and had expired both times before it even started. (*Id.*) In addition, Plaintiff stated that the diet was written again in August and still

had not started.  (*Id.*)  Defendant White noted, "Please put on inmate letter addressed to the FHA [Facility Health Administrator] to be processed properly."  (*Id.*)

Plaintiff's vitals were taken on October 18, 2018, and he weighed 192 pounds. (Doc. 80-24 at 2 (Defs.' Ex. X).)

On October 26, 2018, Defendant White saw Plaintiff for a scheduled nurse sick call, and Plaintiff complained that he was not receiving his diet.  (Doc. 80-25 at 2 (Defs.' Ex. Y).)  Plaintiff's vitals were taken, and he weighed 196 pounds.  (*Id.* at 3.)  Defendant White referred Plaintiff to the provider.  (*Id.* at 5.)

On October 31, 2018, Plaintiff submitted an HNR stating that he was surviving only on a couple hundred calories a day and requested for his vitals and weight to be checked. (Doc. 80-26 at 2 (Defs.' Ex. Z).)  Defendant White noted that Plaintiff was scheduled for the nursing line.  (*Id.*)

On November 1, 2018, Defendant White saw Plaintiff for a nurse treatment call. (*Id.* at 3.)  Defendant White checked Plaintiff's vitals and weight, and it was noted that Plaintiff weighed 182 pounds.  (*Id.*)  Defendant White assessed Plaintiff as "[r]isk for altered nutrition."  (*Id.* at 4.)

On November 2, 2018, Plaintiff submitted an HNR stating that he had been without a diet for 11 days and asked for a new diet to be written.  (Doc. 80-27 at 2 (Defs.' Ex. AA).) Defendant White noted that a new diet order would be written.  (*Id.*)

On November 6, 2018, Plaintiff submitted an HNR stating that it had been 14 days since his diet had lapsed and that he was starving and requesting for his vitals and weight to be checked.  (Doc. 80-28 at 2 (Defs.' Ex. BB).)  Defendant White noted that Plaintiff was scheduled for nursing line.  (*Id.*)

On November 7, 2018, Defendant White saw Plaintiff for a nurse treatment call. (Doc. 80-29 at 2 (Defs.' Ex. CC).)  Defendant White checked Plaintiff's vitals and weight and noted that Plaintiff's weight was 179 pounds.  (*Id.*)  Defendant White assessed Plaintiff as "alteration in nutrition."  (*Id.* at 3.)

On November 12, 2018, Plaintiff submitted an Inmate Informal Complaint Resolution complaining that "medical has written my diet 5 times in the past year" but his diet had "expired before it was implemented every time." (Doc. 111-2 at 30 (Pl.' Ex. T).) That same day, Plaintiff submitted an Inmate Letter addressed to Defendant Ryan with a copy of his Inmate Informal Complaint Resolution attached to it. (Doc. 111-2 at 36 (Pl.'s Ex. V).) In the Inmate Letter, Plaintiff complained that since his medical diet expired on October 23, 2018, he had lost "a total of 17 pounds in 20 days" and had been starving as a result of not receiving his medical diet. (*Id.*)

Plaintiff's Inmate Letter was forwarded to Program Evaluation Administrator Vanessa Headstream, and she responded: "In researching your medical concerns, I am advised that a no-gluten diet was prescribed for you on 12/06/18. . . . I am forwarding a copy of this correspondence to Corizon for their additional review and any action considered necessary at this time. It is also being provided to the ADC Health Services Bureau monitor at ASPC-Lewis for further follow up." (*Id.* at 39.)

On November 15, 2018, Plaintiff submitted an HNR stating that it had been twenty-three days since his diet had lapsed, he was surviving on a few hundred calories a day, and requested for his vitals and weight to be checked; Plaintiff noted that he had dropped approximately 16 pounds in two weeks. (Doc. 80-30 at 2 (Defs.' Ex. DD).) Defendant White noted that Plaintiff was scheduled for the nursing line. (*Id.*)

On November 16, 2018, Defendant White saw Plaintiff for a scheduled nurse sick call. (Doc. 80-31 at 2 (Defs.' Ex. EE).) Defendant White checked Plaintiff's vitals and weight and noted that he weighed 175 pounds. (*Id.* at 3.) Defendant White forwarded this information to the provider to review. (*Id.* at 6.)

On November 21, 2018, Plaintiff submitted an HNR stating that he still had not received his medical diet and "continue[d] to starve." (Doc. 111-1 at 50 (Pl.'s Ex. N).) Plaintiff was scheduled for the nursing line. (*Id.*) On November 23, 2018, Plaintiff's weight was documented as 172 pounds. (Doc. 111-2 at 7 (Pl.'s Ex. P).)

On November 28, 2018, Plaintiff submitted an HNR stating that it had been 36 days since his diet had lapsed, he was starving, and requested for his weight to be checked. (Doc. 80-32 at 2 (Defs.' Ex. FF).)  Defendant White noted that Plaintiff was scheduled for the nursing line.  (*Id.*)

On November 29, 2018, Vanessa Headstream sent an email to FHA Czigler stating that Plaintiff's no gluten diet had expired on October 23, 2018 "without being renewed" and that "[h]e has submitted HNRs related to the matter but no action appears to have been taken to re-order the diet.  Will you review and advise of action to be taken?"  (Doc. 111-3 at 2 (Pl.'s Ex. Z).)  FHA Czigler forwarded Headstream's email to NP Ende and advised NP Ende to "advise me of when it is renewed."  (*Id.*)

On December 1, 2018, Defendant White saw Plaintiff for a nurse treatment call. (Doc. 80-33 at 2 (Defs.' Ex. GG).)  It was noted that Plaintiff stated that he was unable to speak with the provider on November 24 about his diet.  (*Id.*)  In addition, Plaintiff stated that he had not yet received his diet and had signed the diet card several times, the last time being November 2.  (*Id.*)  Defendant White checked Plaintiff's vitals and weight and noted that he weighed 168 pounds.  Defendant White assessed Plaintiff as "altered nutrition" and sent the following email to the provider, the FHA, the Assistant FHA, and the Director of Nursing:

> I have [Plaintiff] who has been having issues with his non gluten diet.  He has signed 6 diet cards in the last 2 months give or take.  The last one being a month ago.  [Plaintiff] is unable to eat anything gluten on the tray and has lost 27 pounds in this time.  [Plaintiff] is complaining of fogginess and lethargy at this time.  Please advise on how we can help him get his diet in place as this is an allergy diet and he is unable to eat as he needs to.

(*Id.* at 3–4; Doc. 111-3 at 4 (Pl.'s Ex. AA).)

On December 3, 2018, Plaintiff submitted an HNR stating that it had been forty days since he had his diet.  (Doc. 80-34 at 2 (Defs.' Ex. HH).)  In addition, Plaintiff stated that

1   he ate gluten and now had diarrhea.  (*Id.*)   Defendant White noted that Plaintiff was

2   scheduled for the nursing line.  (*Id.*)

3       On December 6, 2018, Vanessa Headstream sent a follow-up email to FHA Czigler

4   stating: "I don't see where any action has been taken regarding the specialty diet.  What is

5   your plan of action to address his medical needs?" (Doc. 111-3 at 6 (Pl.'s Ex. BB).)  Czigler

6   responded, "I will address with his provider."  (*Id.* at 8 (Pl.'s Ex. CC).)   That same day,

7   Czigler sent an email to NP Ende stating, "Is there a reason he has not had his no gluten

8   diet SNO [Special Needs Order] renewed[?]"  (*Id.* at 10 (Pl.'s Ex. DD).)

9       Also that same day, NP Ende reviewed Plaintiff's chart and noted "no gluten diet

10  expiring/expired" and "no gluten only form completed, needs inmate signature." (Doc. 80-

11  35 at 2, 4 (Defs.' Ex. II).)  That same day, NP Ende completed a Restricted Diet Order for

12  Plaintiff to be placed on a gluten-free diet with an expiration date of December 6, 2019;

13  the document still needed Plaintiff's signature.  (*Id.* at 6.)

14      On December 7, 2018, Plaintiff submitted an Inmate Grievance regarding his non-

15  gluten diet plan.  (Doc. 80-36 at 2 (Defs.' Ex. JJ).)  On December 24, 2018, FHA Czigler

16  responded: "Your concern has been researched and your SNO for a Gluten Free diet was

17  renewed on 12/6/18 by your provider. You have signed your diet plan and it has been

18  forwarded to the site medical director for final approval which will then be sent to dietary

19  offices." (*Id.* at 3.)

20      On December 8, 2018, Plaintiff submitted an HNR stating: "Still starving, no diet

21  for 46 days.  Please check my weight and vitals." (Doc. 111-2 at 4 (Pl.'s Ex. O).)  Plaintiff

22  was scheduled for the nursing line.  (*Id.*)

23      On December 10, 2018, Vanessa Headstream sent the following email to physician

24  David Robertson: "Does it require discussion?  The diet was ordered, [Plaintiff] needs to

25  sign the form so it can be sent to food services.  Have nursing call [Plaintiff] to medical to

26  sign the form, or, take the form to [Plaintiff] for signature." (Doc. 111-3 at 14.)  Robertson

27  responded, "I think the issue might be is it truly a gluten sensitivity[,]" to which

28  Headstream replied: "There is a documented gluten allergy with a no gluten diet for 2+

years." (*Id.*)   Robertson sent another response stating: "Looks like there might be something more than a gluten allergy.  Since he is a lifer, what do you think of putting him on the Wednesday list for discussion.  Talk tomorrow. [The remainder of the email is redacted]." (*Id.*)  Headstream sent a reply, but it was redacted.  (*See id.*)

On December 18, 2018, Plaintiff submitted an HNR stating that it had been 56 days since his diet had lapsed and requested for his weight to be checked.  (Doc. 80-37 at 2 (Defs.' Ex. KK).)  Defendant White noted that Plaintiff was scheduled for the nursing line. (*Id.*)

On December 21, 2018, Defendant White saw Plaintiff for a nurse treatment call. (Doc. 80-38 at 2 (Defs.' Ex. LL).)  Defendant White checked Plaintiff's vitals and weight and noted that Plaintiff weighed 166 pounds.  (*Id.*)  Defendant White assessed Plaintiff as "altered nutrition" and noted to discuss the diet issue with the provider.  (*Id.* at 3–4.)  That same day, Defendant White submitted a diet order to the provider for approval, and through a series of phone calls and emails, was able to get the diet approved that same day.  (Doc. 111-2 at 20.)

The following day, it was noted that verbal diet order for a no gluten diet was ordered with an approximated begin date of December 22, 2018 and an approximated end date of December 22, 2019.  (Doc. 80-39 at 4 (Defs.' Ex. MM).)

On January 3, 2019, Plaintiff's weight was documented at 175 pounds, and on January 7, 2019, he weighed 177 pounds.  (Doc. 111-1 at 7.)

On January 4, 2019, Plaintiff submitted an Inmate Informal Complaint Resolution regarding his diet, and in a response from the Director of Nursing dated January 19, 2019, Plaintiff was advised: "After review of your medical records, a special diet order was placed on 12/22/18. I have asked medical to confirm your diet order, issue you a diet care and let [the] kitchen know about your diet.  If your condition changes please submit an HNR to see your provider."  (Doc. 111-2 at 34 (Pl.'s Ex. U).)

1       On February 22, 2019, Defendant White checked Plaintiff's weight and vitals,

2   during a chart review and noted that Plaintiff weighed 190 pounds.  (Doc. 80-40 at 2 (Defs.'

3   Ex. NN).)

4       According to Defendant White, the process for issuing medical diets to prisoners

5   works as follows:

> Inmate requests the diet via HNR; Nurse sees patient and
> interviews the patient; Nurse asks Provider to provide diet;
> Provider agrees to diet and fills out paperwork and the Nurse
> procures the signature of the patient for the diet card, and the
> diet card then goes back to the Provider; the Provider gives it
> to Admin who then sends it to Corporate; Corporate approves
> or disapproves and then sends it back to [the prison] if it is
> approved; it is then sent [ADC] who laminates and issues out
> the card to the patient.

(Doc. 111-2 at 3 (Pl.'s Ex. R).)

**IV.   ADA Claim**[2]

    **A.   Legal Standard**

    Under Title II of the ADA, "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity."  42 U.S.C. § 12132.  A "public entity" is "any State or local government; [or]

any department, agency, special purpose district, or other instrumentality of a State or

States or local government."  42 U.S.C. § 12131.  Individuals, however, may *only* be sued

under the ADA in their official, rather than, their individual capacities.  *Vinson v. Thomas*,

288 F.3d 1145, 1156 (9th Cir. 2002) (plaintiff cannot sue state officials in their individual

capacities to vindicate rights created by Title II of the ADA).

    To prevail on a claim under Title II of the ADA, a plaintiff must show that he: (1)

is an "individual with a disability"; (2) "is otherwise qualified to participate in or receive

---

[2] Defendants did not address Plaintiff's ADA claims in their Motion for Summary Judgment or in their reply brief.  (*See* Docs. 79, 121.)  However, because the ADA claims fail as a matter of law, as discussed herein, the Court will dismiss those claims.

the benefit of a public entity's services, programs or activities"; (3) "was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity"; and (4) "such exclusion, denial of benefits, or discrimination was by reason of his disability." *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S. Ct. 1765 (2015). The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Claims under the ADA cannot be based on medical treatment decisions. *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005).

## B.    Discussion

To the extent Plaintiff can assert a viable ADA claim, he may sue only the public entity or public official – in this case Shinn – representing that entity, in his official capacity. 42 U.S.C. § 12131; *Vinson*, 288 F.3d at 1156 (9th Cir. 2002). Plaintiff's ADA claims against Defendants Ryan and White—who are only sued in their individual capacities—thereby fail as a matter of law. *Walsh v. Nevada Dept. of Human Resources*, 471 F.3d 1033, 1037 (9th Cir. 2006) ("individual defendants cannot be held personally liable for violations of the ADA").

Likewise, Plaintiff's Title II ADA claim against Defendant Corizon must also be dismissed because Corizon is not a "public entity" for purposes of Title II. 42 U.S.C. § 12132. The term "public entity" is defined in relevant part as "(A) any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. . . ." 42 U.S.C. § 12131(1). Various courts have considered whether a private corporation operating, managing, or providing services to a state agency or department constitutes a "public entity" under Title II. The clear weight of authority dictates that a private corporation does not constitute "an instrumentality" of the State or local government under Title II.

- 14 -

In an unpublished decision, the Ninth Circuit stated that dismissal of a plaintiff's ADA claim against Corizon was proper.  *See Valenzuela v. Masoon*, 730 Fed.Appx. 524 (9th Cir. 2018).

In *Green v. City of New York*, 465 F.3d 65, 78 (2d Cir. 2006), the Second Circuit affirmed the dismissal of a Title II claim against a private hospital on the basis that it was not a "public entity" within the meaning of the ADA, despite being under contract to the city and subject to the direction of city employees.  In *Edison v. Douberly*, 604 F.3d 1307, 1308-1309 (11th Cir. 2010), the Eleventh Circuit held that a private prison did not become liable under Title II of the ADA "merely by contracting with the State to provide governmental services, essential or otherwise."

Numerous courts have followed *Green* and *Edison* by concluding that a private prison corporation does not constitute a "public entity" within the meaning of Title II of the ADA.  *See Wilkins-Jones v. County of Alameda*, 859 F. Supp. 2d 1039, 1046-47 (N.D. Cal. 2012) (discussing the prevailing view in the circuit courts that government contractors are not liable under Title II as public entities, stating, "entities otherwise subject to Title II should not be able to escape liability merely by contracting with a private entity for performance of essential government function—is answered by the fact that . . . the public entity remains liable for the unlawful acts of its agent, even if" the private entity "is not itself liable under Title II."); *see also Knows His Gun v. Montana*, No. CV11-0042, 2012 WL 2087226, at *9 (D. Mont. Feb. 29, 2012) (distinguishing application of ADA from RLUIPA to private prisons); *Medina v. Valdez*, No. 1:08CV0456, 2011 WL 887553, at *2-4 (D. Ida. Mar. 10, 2011) (holding a private prison is not a public entity under the ADA); *Phillips v. Tiona*, No. 10CV0334, 2012 WL 452726, at *1-2 (D. Colo. Feb. 13, 2012); *Maxwell v. South Bend Work Release Center*, 787 F.Supp.2d 819, 822-23 (N.D. Ind. 2011); *York v. Forest View Psychiatric Hosp.*, No. 1:10cv28, 2011 WL 1792301, at *3 (W.D. Mich. Apr. 19, 2011); *cf. Castle v. Eurofresh, Inc.*, 734 F. Supp. 2d 938, 943 (D. Ariz. 2010) (holding private company that contracted with a state prison to employ prisoners to pick tomatoes was not an "instrumentality" of the State under the ADA).  Therefore,

1    Plaintiff's Title II ADA claim against Corizon fails for this reason, and that claim will be

2    dismissed.

3         Finally, Plaintiff's ADA claim against Defendant Shinn fails because receiving a

4    special diet is not considered a "program" under Title II.  *See Reyes v. Ryan*, No. CV 09-

5    2020-PHX-SMM (DKD), 2009 WL 10677722 at *2 (D. Ariz. Nov. 24, 2009) (ADA claim

6    brought by prisoner plaintiff who was denied a diabetic diet failed because diabetic diet

7    was not a "service, program, or activity" under the ADA); *see also Carrion v. Wilkinson*,

8    309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004) (finding that denial of diabetic diet is not

9    the type of claim the ADA was intended to cover).  Plaintiff's ADA claim is based on

10   inadequate treatment for his disability rather than discrimination because of his disability.

11   Although the ADA affords disabled persons legal rights regarding access to programs and

12   activities enjoyed by all, it does not provide them with a general federal cause of action for

13   challenging the medical treatment of their underlying disabilities.  *Burger*, 418 F.3d at 883

14   (holding that ADA claims cannot be based on medical treatment decisions); *Schiavo ex.*

15   *Rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (finding that the ADA

16   "was never intended to apply to decisions involving . . . medical treatment"); *Bryant v.*

17   *Madigan,* 84 F.3d 246, 249 (7th Cir.1996) (concluding that the ADA "would not be

18   violated by a prison's simply failing to attend to the medical needs of its disabled prisoners"

19   and that the statute "does not create a remedy for medical malpractice").

20        Moreover, there is no evidence in the record that Plaintiff was denied the benefits

21   of any services, programs, or activities provided for other non-disabled prisoners or that

22   his medical diet was denied and/or delayed *because of* his purported disability.  *Carrion*,

23   309 F. Supp. 2d at 1016 (prisoner failed to state ADA claim where he alleged only that the

24   prison had refused to provide him with a diabetic diet, but did not allege that prison officials

25   denied him "the benefits of any services, programs, or activities provided for other non-

26   disabled inmates, or that they subjected him to discrimination because of his diabetes").

27   The failure to provide adequate medical treatment "does not fall within the provisions of

28   the ADA[.]"  *Brown v. Baca*, 2010 WL 316475, at *7 (C.D. Cal. Jan. 18, 2010).

1   For the foregoing reasons, Plaintiff's ADA claim against Defendant Shinn will also
2   be dismissed.

3   **V.      Eighth Amendment Claim**

4   **A.      Legal Standard**

5   To succeed on a § 1983 medical claim, a plaintiff must show (1) a "serious medical
6   need" by demonstrating that failure to treat the condition could result in further significant
7   injury or the unnecessary and wanton infliction of pain and (2) the defendant's response
8   was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

9   "Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d
10  1051, 1060 (9th Cir. 2004).  To act with deliberate indifference, a prison official must both
11  know of and disregard an excessive risk to inmate health; "the official must both be aware
12  of facts from which the inference could be drawn that a substantial risk of serious harm
13  exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).
14  Deliberate indifference in the medical context may be shown by a purposeful act or failure
15  to respond to a prisoner's pain or possible medical need and harm caused by the
16  indifference.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may also be shown when a
17  prison official intentionally denies, delays, or interferes with medical treatment or by the
18  way prison doctors respond to the prisoner's medical needs.  *Estelle v. Gamble*, 429 U.S.
19  97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

20  Deliberate indifference is a higher standard than negligence or lack of ordinary due
21  care for the prisoner's safety.  *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross
22  negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F.
23  Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458,
24  460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"
25  do not support a claim under § 1983).  "A difference of opinion does not amount to
26  deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d
27  240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to
28  state a claim against prison officials for deliberate indifference.  *See Shapley v. Nev. Bd. of*

*State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 105.

## B.    Serious Medical Need

Here, the parties do not dispute that Plaintiff had a serious medical need, and there is ample evidence in the record showing that Plaintiff was diagnosed with celiac disease, which required him to be placed on a medical diet.  This is sufficient to satisfy the objective prong of the deliberate indifference analysis.  The Court must therefore determine whether each Defendant's response to Plaintiff's serious medical need amounted to deliberate indifference.

## C.    Defendant Ryan

As discussed above, Defendant Ryan only remains as a defendant in his individual capacity.  (*See* Doc. 41.)  To the extent Plaintiff sues Defendant Ryan in his individual capacity, Plaintiff's claims necessarily fail because there is no evidence in the record that Defendant Ryan was personally involved in, or even aware of, any of Plaintiff's issues with his medical diet.

On November 12, 2018, Plaintiff submitted an Inmate Letter addressed to Defendant Ryan with a copy of his Inmate Informal Complaint Resolution attached to it.  (Doc. 111-2 at 36 (Pl.'s Ex. V).)  In the Inmate Letter, Plaintiff complained that since his medical diet expired on October 23, 2018, he had lost "a total of 17 pounds in 20 days" and had been starving as a result of not receiving his medical diet.  (*Id.*)  The Inmate Letter was forwarded to Program Evaluation Administrator Vanessa Headstream, and she responded: "In researching your medical concerns, I am advised that a no-gluten diet was prescribed for you on 12/06/18. . . . I am forwarding a copy of this correspondence to Corizon for their additional review and any action considered necessary at this time.  It is also being provided to the ADC Health Services Bureau monitor at ASPC-Lewis for further follow up."  (*Id.* at 39.)

There is no evidence that Defendant Ryan reviewed or was aware of Plaintiff's Inmate Letter or that Defendant Ryan was made aware of Plaintiff's ongoing diet issues at any time.  Defendant Ryan was not copied on any of the emails sent between Vanessa Headstream, FHA Czigler, and the other officials discussing Plaintiff's diet.  (*See* Doc. 111-3 at 2–14.)  Absent any evidence that Defendant Ryan personally participated in a violation of Plaintiff's constitutional rights, or that he was aware of such a violation and failed to act, Plaintiff's claims against Defendant Ryan in his individual capacity fail, and Defendant Ryan will be dismissed from the action.

### D.      Defendant White

To the extent Plaintiff brings an Eighth Amendment claim against Defendant White, that claim is not supported by the record.[3]  The evidence shows that Defendant White reviewed, processed, and responded to several of Plaintiff's HNRs, typically by informing him that he was being scheduled for the nursing or provider line or by informing him that his diet order was being processed.  The record also shows that Defendant White was not responsible for ordering or approving medical diets, these decisions were made by the providers and the corporate office.  Thus, Defendant White's role in Plaintiff's treatment was mostly administrative.  During her handful of encounters with Plaintiff, Defendant White checked his vitals, and when she noted his rapid weight loss and assessed him as "altered nutrition," she documented it and referred Plaintiff to the provider.  In fact, upon observing Plaintiff's decreasing weight loss, Defendant White not only informed the provider, but she also sent an email to the FHA, the Assistant FHA, and the Director of Nursing voicing her concerns about Plaintiff's weight loss.  When Defendant White found out that Plaintiff was still not receiving his diet, she submitted another diet order to the provider for approval, and through a series of phone calls and emails, was able to get the

---

[3] It is not clear whether Plaintiff intended to assert an Eighth Amendment claim against Defendant White. In the First Amended Complaint, Plaintiff titled Count 3 against White "Americans with Disabilities Act," but he also checked the box labeled, "Basic Necessities," which implies an Eighth Amendment claim.  Because pro se pleadings are to be applied liberally, the Court will also analyze Plaintiff's claim against Defendant White under the Eighth Amendment.

1    diet approved that same day.  On these facts, Defendant White did what was within her
2    power to help Plaintiff get his medical diet.  The evidence does not show that she
3    disregarded Plaintiff's serious medical needs or ignored a significant risk to his health.
4    Accordingly, summary judgment will be granted to Defendant White.

5        **E.    Defendants Shinn and Corizon**

6            To succeed on his Eighth Amendment claim against Defendants Shinn and Corizon,
7    Plaintiff must show that the constitutional violation he suffered occurred as a result of an
8    official policy or custom.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978);
9    *Tsao v. Desert Palace, Inc.*, 698 F .3d 1128 (9th Cir. 2012) (*Monell* requirements apply to
10   private entities sued under § 1983).  This requires the plaintiff to show (1) a constitutional
11   deprivation; (2) that the entity had a policy or custom; (3) that the policy or custom
12   amounted to deliberate indifference to the plaintiff's constitutional right; and (4) that the
13   policy or custom was the moving force behind the constitutional violation.  *Mabe v. San*
14   *Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).  Thus,
15   the critical question in the *Monell* analysis is whether the entity's policy or custom inflicted
16   the harm or injury, or if the harm resulted from the independent acts of a subordinate.  *See*
17   *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 36 (2010).

18           A policy is "a deliberate choice to follow a course of action" made by the officials
19   or entity "responsible for establishing final policy with respect to the subject matter in
20   question."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of
21   action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

22           A "custom" is a "widespread practice that, although not authorized by written law
23   or express municipal policy, is so permanent and well-settled as to constitute a custom or
24   usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  A plaintiff
25   must show that the challenged action is the "standard operating procedure" of the
26   municipality.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation omitted).

27           "Liability for improper custom may not be predicated on isolated or sporadic
28   incidents; it must be founded upon practices of sufficient duration, frequency and

1   consistency that the conduct has become a traditional method of carrying out policy."
2   *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).   While one or two incidents are
3   insufficient to establish a custom or practice, the Ninth Circuit has not established what
4   number of similar incidents would be sufficient to constitute a custom or policy.  *See*
5   *Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19,
6   2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon
7   denying or delaying consultations and radiation treatment for cancer patient over a year
8   amounts to a custom or practice of deliberate indifference) (citing *Oviatt By & Through*
9   *Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992)).   "There is no case law indicating
10  that a custom cannot be inferred from a pattern of behavior toward a single individual."
11  *Id.*

12              **1.     Constitutional Violation**

13              On this record, a reasonable jury could find that Plaintiff's Eighth Amendment
14  rights were violated where the evidence shows that Plaintiff had a documented diagnosis
15  of celiac disease for which he was prescribed a no gluten diet with supplements, and despite
16  his submission of over a dozen HNRs informing the medical staff that he was not receiving
17  his medical diet, and despite it being documented that he was rapidly losing weight as a
18  result of not receiving his diet, Plaintiff still did not receive his no gluten diet with
19  supplements in a timely fashion.   It is well-established in the record that several medical
20  staff members and officials, including the Director of Nursing, the FHA, and the Program
21  Evaluation Administrator were aware of Plaintiff's diet issues, but it still took several
22  months for his diet to be approved and implemented.   During this time, Plaintiff lost a
23  significant amount of weight, and at one point, lost 16 pounds in two weeks and, on medical
24  exams, was repeatedly documented as having "altered nutrition."   These facts are more
25  than enough to show that officials were aware of Plaintiff's serious medical need and failed
26  to take adequate action to make sure that Plaintiff's medical diet was renewed and
27  implemented in a timely fashion.   Thus, there is a question of fact whether Plaintiff's Eighth
28  Amendment rights were violated.

### 2.      Existence of a Deliberately Indifferent Policy or Custom

A reasonable jury could also find that there was an unwritten policy or custom of denying or delaying medical diets.  The evidence shows that, over a one-year period from January 2018 to January 2019, Plaintiff submitted dozens of HNRs and grievance documents complaining that he was not receiving his medical diet in a timely fashion.  In several of these, Plaintiff stated that he was rapidly losing a large amount of weight and that he was starving.  Despite submitting these documents and losing a significant amount of weight in a short period of time, medical staffers and prison officials failed to take adequate steps to make sure Plaintiff's medical diet was renewed and actually given to him.  On several occasions, his medical diet expired before he even received it, and he was forced to start the process over again.  In response to many of his HNRs, Plaintiff was informed that it could take up to a month for a medical diet to be approved.

This evidence demonstrates more than isolated incidents of denied care or failure to respond to a Plaintiff's serious medical need; rather, it suggests that the prison medical staff and other officials completely failed to properly respond to Plaintiff's need for a prescribed medical diet for months at a time.  A reasonable jury could find that this repeated failure to respond to Plaintiff's need to receive his prescribed diet amounted to a policy or custom.  *See Gibson v. County of Washoe*, 290 F.3d 1175, 1194– 95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

Moreover, a jury could find that a policy or custom in which it takes up to a month, and sometimes longer, to approve a medical diet, even when the patient requests a renewal in a timely fashion, amounts to a deliberately indifferent policy or custom.  Accordingly, there is a question of fact whether Defendants Corizon and Shinn implemented a deliberately indifferent policy or custom.

### 3.      Policy was Moving Force Behind the Violation

A policy or custom is the moving force behind a constitutional violation when it is "closely related to the ultimate injury" and when the plaintiff can "establish that the injury would have been avoided had proper policies been implemented."  *Long*, 442 F.3d at 1190

- 22 -

(9th Cir. 2006) (internal quotation marks omitted).  Here, a reasonable jury could conclude that the policy/custom of denying or delaying medical diets was "closely related" to Plaintiff's injury, i.e. his rapid weight loss.  Additionally, the record shows that when Plaintiff finally began receiving his medical diet, he started returning to his normal body weight.  Thus, there is a question of fact whether Plaintiff's rapid weight loss could have been prevented had proper policies been in place.

In short, there is sufficient probative evidence in the record to create a triable issue whether the Defendants Corizon and Shinn are liable under § 1983 for violation of Plaintiff's constitutional rights, and summary judgment as to Plaintiff's Eighth Amendment claim against them will be denied.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 79).

(2)     Defendants' Motion for Summary Judgment (Doc. 79) is **granted in part and denied in part** as follows:

(a)     The Motion is **granted** as to Plaintiff's ADA claims against Defendants Corizon, Ryan, White, and Shinn.

(b)     The Motion is **granted** as to Plaintiff's Eighth Amendment claims against Defendants Ryan and White.

(c)     The Motion is **denied** as to Plaintiff's Eighth Amendment claims against Defendants Corizon and Shinn.

(3)     Defendants Ryan and White and Plaintiff's ADA claim are dismissed from the action **with prejudice**.

(4)     The action is referred to Magistrate Judge Camille D. Bibles to conduct a settlement conference as to Plaintiff's Eighth Amendment claims against Defendants Corizon and Shinn.

(5)     Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Bibles' chambers at (928) 774-2566 **within 14 days** to schedule a date

for the settlement conference.

(6)    The parties must file a joint status report within **thirty (30) days** of the settlement conference if it is not successful, proposing dates to file their joint proposed pretrial order.

Dated this 23rd day of July, 2021.

Michael T. Liburdi
United States District Judge